Filed 5/6/21  In re B.D. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re B.D., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.D., et al.,<br><br>Defendants and Appellants. | D078014<br><br>(Super. Ct. No. EJ4324A, B) |

APPEALS from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Jill Suzanne Smith, under appointment by the Court of Appeal, for Defendant and Appellant, C.D.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant, R.Q.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

C.D. (Father) and R.Q. (Mother) appeal from the juvenile court's orders terminating parental rights to their son, B.D. (born 2012) and daughter L.D. (born 2015, together the children). (Welf. & Inst. Code, § 366.26.)[1] The parents contend the juvenile court erred in finding that the beneficial parental relationship exception to adoption did not apply because the evidence demonstrated that terminating parental rights would be detrimental to the children's well-being. They assert that a legal guardianship was the only appropriate permanent plan for the children. (§ 366.26, subd. (c)(1)(B)(i).) We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

The San Diego County Health and Human Services Agency (Agency) became involved with this family in August 2018 after sheriff's deputies responded to a domestic violence incident where Mother pepper sprayed Father and then Father chased Mother down the street. The following month, the Agency received a report that Mother barricaded herself in a bathroom during an argument and that Father broke the door down. B.D. observed the parents hitting and yelling at each other and stated that Mother was "very hurt" and that he and his sister were scared. The children also observed a 2017 incident where Mother sustained bruising around her neck, scratches, and lost her voice for two weeks after Father strangled her.

When the Agency investigated, the parents appeared to be on some type of stimulant. The Agency found marijuana and drug paraphernalia in the parents' bedroom and within the children's reach. The Agency also found two bags of empty cans or bottles of alcohol in the bedroom. The parents

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

reported methamphetamine use and Father expressed concern that Mother had an alcohol problem.

In August and September 2018, the Agency requested that Mother drug test seven times, but she only tested twice. She tested positive for methamphetamine, alcohol, and tetrahydrocannabinol (THC) for the first test, and positive for alcohol and THC for the second test. The Agency requested six drug tests for Father over a three month period. He tested twice with both tests positive for THC.

In late October 2018, the Agency filed petitions on behalf of the children under section 300, subdivision (b)(1), alleging that a substantial risk existed that the children would suffer serious physical harm or illness based on the parents' physically violent relationship and use of dangerous drugs.[2] The protective custody warrant affidavits indicated that the children "have expressed feeling scared and crying while witnessing the domestic altercations which is putting them at a high risk of suffering emotionally with depression or anxiety in their future. The children have been observed to show that they are being neglected with their lack of cleanliness, rotting teeth, unchanged diaper at the age of 3.5, and expressing hunger."

At the detention hearing, the juvenile court made a prima facie finding on both petitions. The juvenile court detained the children and ordered supervised visitation for the parents. At the contested adjudication and disposition hearing in January 2019, the juvenile court sustained the

---

[2]     Mother has been involved with the Agency since 2004 regarding allegations of domestic violence, neglect, and alcohol abuse. She has three older children who are not parties to this appeal with another man. The father of these children stated that he has full custody and that Mother "hardly [saw]" these children. Mother received voluntary services in 2004 and again in 2010, but she failed to engage in the recommended services.

petitions, declared the children dependents, placed them with the paternal grandmother D.B. (the caretaker), and ordered reunification services.

In late August 2019, the juvenile court terminated reunification services and set a section 366.26 hearing, which it later rescheduled three times. At the contested section 366.26 hearing in September 2020, the juvenile court found that the parents consistently visited the children, but determined that they did not fulfill a parental role. The court terminated the parents' parental rights, selected adoption as the children's permanent plan, and designated their current caregiver as the prospective adoptive parent. The parents timely appealed.

DISCUSSION

"At a section 366.26 hearing the juvenile court has three options: (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care. [Citation.] Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan. [Citation.] The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

One of the exceptions to the preference for adoption is the beneficial parent-child relationship exception. The exception provides that the court shall terminate parental rights unless "[t]he court finds a compelling reason

4

for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The existence of this relationship is determined by taking into consideration "the age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

The parent must not only demonstrate the positive aspects of the relationship, but "must show the child would suffer detriment if his or her relationship with the parent were terminated." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) For the exception to apply, severing of the relationship must " 'deprive the child of a *substantial,* positive emotional attachment such that the child would be *greatly* harmed.' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 (*Marcelo B.*).) " 'A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' " (*Ibid.*)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)[3]

---

[3] The question of what standard of appellate review applies to the beneficial parent-child relationship exception is currently pending before our Supreme Court. (*In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.)

Here, the juvenile court found that the parents "easily met" their burden of showing consistent visitation with the children. After acknowledging the need for a "robust individualized inquiry" the juvenile court determined that the parents' relationship with the children did not rise to the level of a parental role. The court found the parents' substance abuse, and the impact this had on their ability to safely parent their children, to be their "core issue." The court stated that despite the parents' progress with online services and their loving visits with the children, that the parents' remained untreated for substance abuse. The court explained:

> "Until these parents address this major underlying cause of all . . . the instability and disruption and chaos in their lives, substance abuse, they will never be able to safely and reliable parent. They had two years to address these issues in this case and unfortunately have chosen not to."

Even assuming the parents met their burden of showing a parental relationship, the juvenile court found that they did not meet their burden of proving that severance of that relationship would be detrimental to such a degree that termination of parental rights and a permanent plan of adoption would be detrimental to the children. The court first noted that the caretaker has consistently said that she supports the parents having a relationship with the children as long as the relationship was "healthy" and that the caretaker has facilitated and encouraged visits between the parents and the children. Nevertheless, the court considered the possibility that termination of parental rights could sever the children's relationship with their parents, but found this would not be detrimental to the children such that the detriment outweighed the benefits of adoption.

The parents contend that the parent-child relationship exception applies because they consistently visited with the children, the children would be sad if they knew they would not be able to see the parents again, and terminating parental rights would be detrimental to the children's well-being. It is undisputed that the parents consistently visited the children, satisfying the first prong of the exception. Assuming the parents undertook a parental role during supervised visits with the children, they failed to identify any evidence which would compel a finding that termination of their parental rights would cause the children great harm.

By the time of the section 366.26 hearing on September 29, 2020, B.D. was seven years old and L.D. was five years old and they had spent approximately 23 months out of the parents' care and custody. Due to the parents' inconsistent participation and failure to progress with their case plans, the court terminated reunification services approximately 12 months after the children's removal. The social worker testified that the parents and children had a "friendly" and "loving" relationship, that the children looked forward to visits, and displayed affection toward the parents. The social worker expressed concerns, however, whether the parents could "safely parent and care" for the children. On this point, the juvenile court found that until the parents addressed their substance abuse they would "never be able to safely and reliable parent" their children.

Parental substance abuse is presumptively detrimental to the safety, protection and physical and emotional well-being of the child. (§ 300.2 ["The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child."].) The record supports the juvenile court's finding that the parents' untreated substance abuse impacted the "beneficial"

7

nature of the relationship. A 2010 referral pertaining to Mother's three older children described Mother as an alcoholic. During the initial investigation for the instant matter, the caretaker reported that Mother got " 'drunk every single night' " and "always drive[s]" the children while intoxicated. A substance abuse specialist who evaluated Mother expressed the belief that Mother required substance abuse treatment, but Mother denied having a substance abuse problem and was unwilling to obtain treatment. When asked about Mother's alcohol use B.D stated that " 'Mom drinks a lot and mom was so full of alcohol she was talking so, so bad like she was going to die.' "

The social worker submitted drug test referrals for Mother in February, March, April, May and June 2019, but she failed to show to every appointment. During a July 26, 2019 office visit, Mother claimed "her clean date was 'sometime in [2018].' " Mother expressed confidence that she would test "clean" that day, but did not respond when asked why she had not drug tested in the last six months. Although Mother appeared for an intake appointment for substance abuse treatment, she never returned to the program.

Father admitted that he started using marijuana at age 13, currently used marijuana once or twice a day, and "occasionally" drank alcohol. He denied current methamphetamine use, but admitted "having a problem" with the drug in the past. Mother stated, however, that Father used methamphetamine and took "baking soda to pass his tests." Although Father did not believe he needed substance abuse treatment, Father failed to demonstrate his sobriety by drug testing. He failed to drug test three times in November and December 2018. The social worker submitted drug test referrals for Father in February, March, April, May and June 2019, but he

failed to show to every appointment. When the social worker informed Father that he only needed to drug test twice to satisfy his case plan objective, Father denied receiving the social worker's calls and text messages regarding testing.

On August 20, 2019, the social worker left Father a voice message advising him that he needed to submit to a random drug test, but Father did not appear for this drug test, which the Agency considered to be a positive test. Two days later, the social worker advised the parents that they needed to drug test that day, which they agreed to do. However, one hour later, the social worker received a voicemail from Mother stating that she and Father would not drug test because it conflicted with their services. "[T]he juvenile court could reasonably conclude that common sense suggests a parent who consistently fails to appear for drug tests does so because of a consciousness of guilt." (*In re Noah G.* (2016) 247 Cal.App.4th 1292, 1304 (*Noah G.*).)

While the parents had a loving bond with their children, the juvenile court properly noted that their untreated substance abuse impacted the "beneficial" nature of the relationship by threatening the depth and stability of the parental relationship. (*Noah G.*, *supra*, 247 Cal.App.4th at p. 1302 [in considering the parent-child relationship exception "the juvenile court could properly focus on the mother's unresolved substance addiction issues because the children became dependents of the court due to her drug abuse"].) Mother has been involved with the Agency since 2004 and has had 15 referrals most of which involved allegations regarding domestic violence, neglect, and alcohol abuse. The Agency noted that Mother "has consistently shown . . . that her alcohol abuse affects her ability to care for her children by not meeting their basic and medical needs." Likewise, Father has used marijuana for over 22 years and admitted using the drug once or twice a day.

9

The juvenile court described the parents' untreated substance abuse as the "elephant in the room." Although the parents had almost two years to address this issue, they failed to do so. Meanwhile, the children's caretaker has provided the children with a stable and loving home. As the court-appointed special advocate noted in her January 2020 report:

> "The [children's caretaker] is interactive and talks a lot to the children. She is strict with them but they seem to respect her most of the time. . . . Both [L.D. and B.D.] are very independent and self-sufficient children, but they will seek out their [caretaker] for food, permission, and sometimes comfort. During this reporting period, both children have become comfortable in their home, and appear to be flourishing with the structure and consistency that the [caretaker] provides. While things in the home have not always been smooth, the [caretaker] appears dedicated to ensuring the children are safe, well cared for, and loved. According to the [caretaker], she is very interested in adopting [the children] if reunification is not successful, and she has spoken to the resource HHSA social worker about the process."

B.D. understood that adoption meant that his caretaker would be his mom and that he and his sister would stay with the caretaker. When asked how he felt about being adopted Brandon stated, "I would want to live with my [caretaker] because my parents can't take care of us." B.D. indicated that "nothing" would make him feel happy or safe enough to return to Mother. L.D. loved her parents and wanted to live with them and her caretaker. L.D.,

however, expressed concern that if returned to her parents "we don't do anything. They don't take us to school, the pool or camping. All we do is watch them fight and that makes me scared."

Although the evidence revealed the existence of a bond between the parents and the children, the parents' unresolved substance abuse issues support the juvenile court's conclusion that, on balance, the benefit of permanency through adoption outweighed any benefit the children might derive from continuing the parent-child relationship. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622-623 ["While the weekly two-hour visits with K.P. and his mother may have been pleasant for both parties, there was no evidence in the record (beyond [mother's] stated belief) that termination of the parent-child relationship would be detrimental to K.P. or that the relationship conferred benefits to K.P. more significant than the permanency and stability offered by adoption"]; *Marcelo B.*, *supra*, 209 Cal.App.4th at p. 644 ["The parents demonstrated that they have a warm and affectionate relationship with their son. Because they continue to abuse alcohol[,] . . . however, they have not demonstrated an ability to provide Marcelo, over the long term, with a stable, safe and loving home environment."]; *In re Jasmine D., supra,* 78 Cal.App.4th at pp. 1351-1352 [beneficial parent exception did not apply despite mother's "successful visitation record" because mother "made no steps toward overcoming the problems leading to [her child's] dependency"].)

The parents contend that the juvenile court erred by choosing adoption as the permanent plan because a legal guardianship would have provided permanency for the children while maintaining the significant relationship the children shared with them. "The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional

11

commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) Given this preference, there must be a compelling reason to choose a permanent plan other than adoption. One was not present here.[4]

Finally, Mother stresses that socio-economic considerations are not legislatively or otherwise properly a part of a consideration regarding application of the parent-child relationship exception. As another court stated "indigency, by itself, does not make one an unfit parent and 'judges [and] social workers . . . have an obligation to guard against the influence of class and life style biases.' " (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212.) While we agree with this statement, we disagree that socio-economic considerations factored into the juvenile court's decision. Nothing in the record suggests that the juvenile court considered the relative socio-economic positions of the parents and the children's caretaker in arriving at its decision.

---

4     Father's reliance on *In re Scott B.* (2010) 188 Cal.App.4th 452 to support his argument that the court should have ordered a legal guardianship is misplaced. This case involved an 11-year-old boy diagnosed with autism. (*Id.* at pp. 455, 471.) Because of the child's special needs, his "emotional state" was "precarious." (*Id.* at p. 472.) He also had a "history of regressing and running away when he [was] stressed. . . ." (*Ibid.*) Given those facts, and evidence that the boy and his mother had "a very close relationship," the Court of Appeal concluded that termination of mother's parental rights would be detrimental to the minor. (*Id.* at p. 471.) In the court's view, "[t]he only way to avoid [a] serious emotional and developmental setback" was to ensure continued visitation with mother. (*Id.* at p. 472.) By contrast, here there is no evidence that termination of parental rights will cause serious emotional and developmental problems for the children.

We therefore affirm the juvenile court's orders as we find no evidence of extraordinary circumstances requiring application of the parent-child relationship exception to the termination of the parents' parental rights.

DISPOSITION

The orders are affirmed.

BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


AARON, J.